# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| **ORANGE COUNTY WATER DISTRICT;** | ) | |
| **CITY OF ANAHEIM;** | ) | |
| **CITY OF BUENA PARK;** | ) | **MDL No. 2873** |
| **CITY OF FULLERTON;** | ) | |
| **CITY OF GARDEN GROVE;** | ) | |
| **CITY OF HUNTINGTON BEACH;** | ) | **Master Docket No. 2:18-mn-2873** |
| **CITY OF NEWPORT BEACH;** | ) | |
| **CITY OF ORANGE;** | ) | **Judge Richard Mark Gergel** |
| **CITY OF SANTA ANA;** | ) | |
| **CITY OF TUSTIN;** | ) | **Civil Action No. 2:24-cv-02846-RMG** |
| **CITY OF WESTMINSTER;** | ) | |
| **EAST ORANGE COUNTY WATER** | ) | |
| **DISTRICT;** | ) | **FIRST AMENDED COMPLAINT AND** |
| **IRVINE RANCH WATER DISTRICT;** | ) | **DEMAND FOR JURY TRIAL** |
| **SERRANO WATER DISTRICT;** | ) | |
| **YORBA LINDA WATER DISTRICT;** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | |
| **AGC CHEMICALS AMERICAS, INC.;** | ) | |
| **ARCHROMA U.S., INC.;** | ) | |
| **ARKEMA, INC.;** | ) | |
| **BASF CORPORATION;** | ) | |
| **BUCKEYE FIRE EQUIPMENT** | ) | |
| **COMPANY;** | ) | |
| **CARRIER FIRE & SECURITY AMERICAS** | ) | |
| **CORPORATION (f/k/a UTC FIRE &** | ) | |
| **SECURITY AMERICAS CORPORATION);** | ) | |
| **CARRIER GLOBAL CORPORATION;** | ) | |
| **CHEMGUARD, INC.;** | ) | |
| **CLARIANT CORPORATION;** | ) | |
| **DYNAX CORPORATION,** | ) | |
| **KIDDE PLC, INC.;** | ) | |
| **NATIONAL FOAM, INC.;** | ) | |
| **TYCO FIRE PRODUCTS LP (successor-in-** | ) | |
| **interest to the ANSUL CO.); and,** | ) | |
| **JOHN DOE DEFENDANTS 1-400,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs ORANGE COUNTY WATER DISTRICT, CITY OF ANAHEIM, EAST

ORANGE COUNTY WATER DISTRICT, CITY OF FULLERTON, CITY OF GARDEN

GROVE, IRVINE RANCH WATER DISTRICT, CITY OF ORANGE, CITY OF SANTA ANA,

SERRANO WATER DISTRICT, CITY OF TUSTIN, YORBA LINDA WATER DISTRICT,

CITY OF HUNTINGTON BEACH, CITY OF NEWPORT BEACH, CITY OF WESTMINSTER, and CITY OF BUENA PARK hereby allege, based on information and belief and investigation of counsel:

## SUMMARY OF THE CASE

1.      Plaintiff Orange County Water District ("OCWD") is a special water district that was formed by the California Legislature in 1933 and is charged with managing the Orange County Groundwater Basin ("Basin"), which is a groundwater aquifer underlying portions of central and northern Orange County, California. OCWD manages three of Southern California's greatest water supplies: the Santa Ana River, the Basin, and the Groundwater Replenishment System ("GWRS"). OCWD captures surface water from the Santa Ana River, then recharges the captured flows into the Basin. The GWRS treats wastewater that OCWD obtains from the Orange County Sanitation District, then recharges the treated flows into the Basin. OCWD possesses rights to draw water from, and valuable rights to, inter alia, recharge and store water in, one or more contaminated local aquifers, including, but not limited to, aquifers within the Basin. OCWD has legally protected interests in the groundwater at issue in this Complaint, and in recharge and storage capacity in the contaminated aquifers. OCWD maintains an appropriative right to reclaim or re-appropriate water it has recharged into the Basin. OCWD works to ensure a reliable supply of high-quality water for more than 2.5 million residents in northern and central Orange County, while protecting environmental habitats and natural resources.

2.      Plaintiffs City of Anaheim, East Orange County Water District, City of Fullerton, City of Garden Grove, Irvine Ranch Water District, City of Orange, City of Santa Ana, Serrano Water District, City of Tustin, Yorba Linda Water District, City of Huntington Beach, City of Newport Beach, City of Westminster, and City of Buena Park (the "Producers") are municipal corporations and special districts that own and operate public water systems that provide drinking water to residents and businesses within their respective service areas. Collectively, the Producers and OCWD are referred to as the "Plaintiffs."

3.      Plaintiffs bring this action in order to address widespread contamination of surface

water and groundwater within the Basin with the synthetic per- and polyfluoroalkyl substances ("PFAS") perfluorooctanesulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluorobutanesulfonic acid ("PFBS"), and perfluorohexane sulfonate ("PFHxS") to recover costs associated with the contamination of drinking water, surface water and groundwater with PFAS, and further seek abatement of the ongoing nuisance these chemicals constitute in the environment, and for such other action as is necessary to ensure that the PFAS that contaminate the surface water and aquifers supplying source drinking water for OCWD and the Producers do not present a risk to the public. In this Complaint, the terms PFAS are intended to include those compounds themselves (including all of their salts and ionic states as well as the acid forms of the molecules) and their chemical precursors.

4.    PFAS are persistent, toxic, and bioaccumulative compounds when released into the environment. PFAS have impacted surface water and groundwater, and now contaminate the water pumped from the Producers' water supply wells. Because of the risks that PFAS pose to human health, the State of California regulates PFOA, PFOS, PFBS, and PFHxS in drinking water at very low levels. The State of California has established notification levels for PFOS of 6.5 parts per trillion ("ppt"), for PFOA of 5.1 ppt, for PFBS of 500 ppt, and for PFHxS of 20 ppt, with response levels for PFOS of 40 ppt, for PFOA of 10ppt, 5,000ppt for PFBS, and 3 ppt for PFHxS.[1]

5.    On April 10, 2024, the United States Environmental Protection Agency issued maximum contaminant levels ("MCLs") for PFOA and PFOS in public drinking water supplies at 4 ppt each and established a "Hazard Index" of 1 ppt for perfluorononanoic acid ("PFNA"), PFHxS, PFBS, and another form of PFAS, known as "HFPO-DA," combined.

6.     Defendants in this case are companies that designed, manufactured, marketed, distributed, and/or sold PFAS, their chemical, and/or products containing PFAS, and/or their chemical precursors (collectively, "Fluorochemical Products").

---

[1] The State of California has been tracking and is likely to regulate additional PFAS, including PFHxA, PFNA, PFDA, and ADONA. Since suit was filed, the State of California established notification and response levels for PFBS and PFHxS. Everywhere this Complaint identifies PFOS, PFOA, PFBS, PFAS, or PFHxS, these references should be read to also include, as applicable, any other analytes as California begins to regulate them.

7.    Defendants' Fluorochemical Products made with PFAS include, but are not limited to waterproofing compounds, stain-proofing compounds, waxes, paper and cloth coatings, and aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires.

8.    Plaintiffs file this lawsuit to seek abatement of an ongoing nuisance, to recover compensatory and all other damages and relief, including all necessary funds to compensate Plaintiffs for the costs of investigating and remediating the contamination of surface water and groundwater impacted by PFOA, PFOS, PFBS, PFHxS (and other PFAS compounds that may subsequently be regulated), designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA, PFOS, PFBS, PFHxS (and other PFAS compounds that may subsequently be regulated) from public water supplies, and for such other damages and relief the Court may order.

9.    A principal purpose of this lawsuit is to hold Defendants liable for the costs the Plaintiffs have incurred, and expect to incur, to clean up the groundwater contamination in the Basin caused by PFAS-containing products manufactured by the Defendants which were introduced into the stream of commerce. Such costs include all necessary funds to investigate, monitor, assess, evaluate, remediate, abate, or contain contamination of groundwater resources within the Basin that are polluted with PFAS. OCWD also seeks to safeguard the quality of the public water resources in the Basin; to prevent pollution or contamination of water supplies; and to assure that the responsible parties – rather than the OCWD, Producers, or taxpayers – bear the cost of responding to and remediating contamination.

10.    Upon information and belief, Defendants' Fluorochemical Products, including but not limited to PFAS containing fluorochemicals/intermediates and AFFF were used at fire training facilities, fire departments, airports, and military installations within the Basin, or upstream of the Santa Ana River such that those compounds traveled by surface, groundwater, and other pathways toward wells within the Basin ("contaminated water resources"). Defendants' Fluorochemical Products were also used and disposed of in and around the Basin, including at multiple landfills

in the Basin such that surface, groundwater, and other pathways caused PFAS to contaminate wells within the Basin. Finally, Defendants' Fluorochemical Products have been used and disposed of into wastewater systems, causing contamination to surface and groundwater in the Basin that traveled to wells within the Basin.

## THE PARTIES

11.    Plaintiff Orange County Water District is a special water district with its principal place of business at 18700 Ward Street, Fountain Valley, California, 92708. OCWD was formed by the California Legislature in 1933 to, among other things, maintain, protect, replenish, and manage the Basin and associated water resources and infrastructure. The Basin provides a water supply to nineteen municipal water agencies and special districts that serve more than 2.5 million Orange County residents. The Producers own and maintain systems that supply water, much of which is extracted by the Producers from the Basin, directly to their customers with certain assistance and oversight from OCWD.

12.    Under its enabling legislation, OCWD has the power to "[t]ransport, reclaim, purify, treat, inject, extract, or otherwise manage and control water for the beneficial use of persons or property within the district and protect the quality of groundwater supplies within the district." OCWD Act § 2, subd. (6)(j).) In furtherance of these goals, OCWD may "commence, maintain, intervene in, defend, and compromise . . . any and all actions and proceedings . . . to prevent . . . diminution of the quantity or pollution or contamination of the water supply of the district." (*Id.* at subd. (9).)

13.    The Legislature expressly granted OCWD the right and duty, among other things, to conduct any investigations of the quality of the groundwater within the Basin to determine whether that water is contaminated or polluted, to perform any necessary investigation, cleanup, abatement, or remedial work to prevent, abate, or contain any threatened or existing contamination or pollution of the surface or groundwater within its territorial jurisdiction, and to recover the costs of any such activities from the persons responsible for the contamination or threatened contamination. (OCWD Act § 8.)

14.     The Legislature also expressly granted OCWD the right and duty, among other things, to litigate in order to protect groundwater resources and to represent the rights of water users within its territorial jurisdiction. (OCWD Act § 2.) OCWD has protectable legal interests in the surface water and groundwater within its territorial jurisdiction, including the right to extract and appropriate surface water and groundwater, replenish the Basin, and to recover the costs of performing these services from anyone who contaminates surface and groundwater in OCWD's territorial jurisdiction.

15.     OCWD has protectable legal interests in the groundwater within the Basin, including the right to extract groundwater, replenish the aquifer, and to recover the costs of performing these services from anyone who appropriates groundwater in OCWD's service area.

16.     Specifically, OCWD has (i) invested in the GWRS and recharges up to 100 million gallons of water per day into the Basin; (ii) acquired and initiated litigation to establish and protect water rights to well over one hundred thousand acre feet of water per year; (iii) purchased tens of thousands of acre feet of water per year from the Metropolitan Water District of Southern California ("MWD"); (iv) stored and delivered water under contract for a fee charged to the MWD; and (v) recharged and stored in the Basin the water it has acquired, reclaimed, and recycled.

17.     OCWD is the exclusive owner of water rights, including water rights set forth in Permit 21243 issued by the California State Water Resources Control Board on or about June 30, 2009, which permit allows OCWD to appropriate up to 362,000 acre feet per year from the Santa Ana River for underground storage and/or surface storage for municipal, industrial, and other beneficial uses and designates the place of use of that water as anywhere "within the Area overlying the Orange County Groundwater Basin."

18.     By storing water in the Basin, for itself and under contract, OCWD does not intend to abandon it. OCWD intends that the water recharged into the Basin will be recaptured for further beneficial use solely by authorized users (who pay the OCWD a replenishment fee for each acre-foot of water extracted) and buyers for authorized uses, and intends to retain the right to prevent

contamination, unauthorized extractions, or other interference with the water while it is stored in the Basin. In addition, OCWD intends that the water in the Basin be used to augment and preserve groundwater levels necessary to maintain the Basin as a long-term water source.

19.    OCWD is also the fee owner, lease holder, and/or easement holder of real property contaminated with PFAS throughout the Basin and outside the Basin including, but not limited to, approximately six miles of the Santa Ana River, land and mineral rights in the cities of Anaheim, Orange, Yorba Linda and elsewhere.

20.    OCWD has conducted, and will continue to conduct, investigations of the quality of the groundwater within the Basin, to perform any necessary investigation, cleanup, abatement, or remedial work to prevent, abate, or contain any threatened or existing contamination or pollution of the surface water or groundwater within its territorial jurisdiction; to further delineate the contamination within the Basin; to design and implement remedial systems to clean up the contamination; to acquire access and property rights necessary to install wells and other equipment to extract and convey the contaminated water; to construct treatment systems to remove the contaminants; and to operate and maintain those extraction and treatment systems until the cleanup is complete. OCWD seeks to protect the surface water and groundwater resources from the threat of further pollution by taking response actions aimed at stopping the horizontal and vertical migration of and remediating the contaminants.

21.    Plaintiff City of Anaheim is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 200 South Anaheim Boulevard, Anaheim, California 92805. Anaheim owns, operates, and maintains a public water system with over 64,000 connections. One or more of Anaheim's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS. For purposes of this Complaint, relevant regulatory limits include the notification and reference levels governed by the State Water Resources Control Board, Order DW 2020-0003-DDW.

22.    Plaintiff East Orange County Water District ("EOCWD") is a special water district that was established in 1961 serving Central Orange County, California with its primary address

at 185 North McPherson Road, Orange, California 92869. EOCWD owns, operates, and maintains a public water system with over 1,200 connections. One or more of EOCWD's potable water wells have exceeded the regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

23.     Plaintiff City of Fullerton is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 303 Commonwealth Avenue, Fullerton, California 92832. Fullerton owns, operates, and maintains a public water system with approximately 32,000 connections. One or more of Fullerton's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

24.     Plaintiff City of Garden Grove is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 11222 Acacia Parkway, Garden Grove, California 92840. Garden Grove owns, operates, and maintains a public water system with over 34,000 connections. One or more of Garden Grove potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

25.     Plaintiff Irvine Ranch Water District ("IRWD") is a California Water District that was established in 1961 serving Central Orange County, California with a primary address at 15600 Sand Canyon Ave, Irvine, California 92618. IRWD owns, operates, and maintains a public water system with over 115,000 connections. One or more of IRWD's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

26.     Plaintiff City of Orange is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 300 East Chapman Avenue, Orange, California 92866. Orange owns, operates, and maintains a public water system with over 36,000 connections. One or more of Orange's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

27.     Plaintiff City of Santa Ana is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 20 Civic Center Plaza, Santa Ana, California 92701. Santa Ana owns, operates, and maintains a public water system with approximately 45,000 connections. One or more of Santa Ana's potable water wells

have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

28.    Plaintiff Serrano Water District ("Serrano") is a special water district that was established in 1876 and provides potable water to the City of Villa Park and a small portion of the City of Orange. Serrano has a primary address at 18021 Lincoln Street, Villa Park, California 92861 and owns, operates, and maintains a public water system with over 2,200 connections. One or more of Serrano's potable water wells have exceeded regulatory limits for PFOS and/or PFOA.

29.    Plaintiff City of Tustin is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 300 Centennial Way, Tustin, California 92780. Tustin owns, operates, and maintains a public water system with over 14,000 connections. One or more of Tustin's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

30.    Plaintiff Yorba Linda Water District ("YLWD") is a special water district that serves residents of Yorba Linda and portions of Placentia, Brea, Anaheim, and areas of unincorporated Orange County. Its primary address is 1717 East Miraloma Avenue, Placentia, California 92870. YLWD owns, operates, and maintains a public water system with over 25,383 connections. One or more of YLWD's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

31.    Plaintiff City of Huntington Beach is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at 2000 Main Street, Huntington Beach, California 92648. Huntington Beach owns, operates, and maintains a public water system with over 54,000 connections. One or more of Huntington Beach's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

32.    Plaintiff City of Newport Beach is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at. Newport Beach owns, operates, and maintains a public water system with over 26,000 connections. One or

more of Newport Beach's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

33.    Plaintiff City of Westminster is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at. Westminster owns, operates, and maintains a public water system with over 20,000 connections. One or more of Westminster's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

34.    Plaintiff City of Buena Park is a municipal corporation organized and existing under the Constitution and laws of the State of California, with its primary address at. Buena Park owns, operates, and maintains a public water system with over 19,000 connections. One or more of Buena Park's potable water wells have exceeded regulatory limits for PFOS and/or PFOA and/or PFBS and/or PFHxS.

35.    Each of the Producers are fee owners, lease holders, and/or easement holders of real and personal property contaminated with PFAS, including but not limited to, fee, lease and/or easement interests in real property where public water supply extraction wells, distribution systems, and reservoirs are located.

36.    Defendant Tyco Fire Products LP ("Tyco") is a limited partnership formed in the State of Delaware with its principal place of business at 1400 Pennbrook Parkway, Lansdale, PA 19446. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI]. Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990. (Ansul and Tyco, as the successor in interest to Ansul, will hereinafter be collectively referred to as "Tyco/Ansul.") Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained fluorochemical surfactants containing PFOA. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute, and sell AFFF that contained fluorocarbon surfactants containing PFOA. Tyco does business throughout the United States and is registered to do business in the state of California.

37.     Defendant BASF Corporation ("BASF") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932, and is registered to do business in California. BASF does business throughout the United States.

a.     On information and belief, BASF is the successor in interest to Ciba Inc. (f/k/a Ciba Specialty Chemicals Corporation). On information and belief. Prior to March 2003, Ciba Inc. manufactured, marketed, promoted, distributed, and/or sold fluorochemicals and fluorosurfactants that contained PFAS used to manufacture AFFF, and those fluorochemicals, fluorosurfactants, and AFFF were transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in California, and have contaminated Plaintiff's Water System.

b.     From approximately 1970-2003, Ciba manufactured several C8-based AFFF fluorosurfactants and had, for a period of time, an agreement to serve as the exclusive provider of fluorosurfactants to Ansul.

38.     Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA. Upon information and belief, Chemguard manufactured, distributed, and/or sold AFFF foam containing PFOA.

39.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Beginning in or around 2004, Buckeye manufactured, distributed, and/or sold AFFF containing PFOA. Buckeye does business throughout the United States and is registered to do business in California.

40.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202, and is registered to do business in California. Clariant is a predecessor to Archroma and was formerly known as Sandoz

Chemicals Corporation and as Sodeyeco, Inc. Upon information and belief, from approximately 1997-2013, Clariant manufactured, marketed, promoted, distributed, and/or sold C8 telomer intermediate products used in the manufacture of AFFF-specific fluorosurfactants, and those fluorochemicals and AFFF were transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in California, and have contaminated Plaintiff's Water System. These fluorosurfactants were purchased by Chemguard and Dynax also named in this Complaint.

41.    Defendant Carrier Fire & Security Americas Corporation (f/k/a UTC Fire & Security Americas Corporation) ("Carrier Fire") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire has done business throughout the United States.

a.    Carrier Fire is the indirect parent of Kidde-Fenwal, Inc.[2], which is the successor in interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc., f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Carrier Fire is also the successor in interest to UTC Fire & Security Americas Corporation, Inc., following the spinoff transaction described immediately below.

b.    Carrier Fire, through Kidde/Kidde Fire, has manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in California, and which has contaminated Plaintiff's Water Supplies. Carrier Fire has done business throughout the United States. In accordance with the KFI Bankruptcy Injunction Order, Plaintiff is filing and effecting service of process of this Complaint to preserve all of its rights and claims with respect to this Defendant;

---

[2] On May 14, 2023, Kidde-Fenwal, Inc. filed for bankruptcy in the case captioned *In re Kidde- Fenwal, Inc.,* Case No. 23-10638-LSS (D. Del. Bankr.). In light of the automatic stay of claims against Kidde-Fenwal, Inc. pursuant to 11 USC § 362, Kidde-Fenwal, Inc. is not named as a defendant herein.

however, Plaintiff reserves all of its rights in connection with the KFI Bankruptcy Injunction Order and otherwise.

42.    Defendant Carrier Global Corporation ("Carrier Global") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

    a.    On or around April 3, 2020, United Technologies Corporation completed the spinoff of one of its reportable segments into Carrier Global, a separate publicly traded company. Pursuant to the Separation and Distribution Agreement by and among United Technologies Corporation, Carrier Global Corporation, and Otis Worldwide Corporation, Carrier Global assumed certain liabilities, including those related to the business operated by Kidde/Kidde Fire. Carrier Global's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Carrier's Fire & Security products and services are sold under brand names that include Chubb and Kidde. At all relevant times, Carrier Global conducted business throughout the United States, including in California.

    b.    Carrier Global, through Kidde/Kidde Fire, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in California, and which contaminated Plaintiff's Water Supplies. In accordance with the KFI Bankruptcy Injunction Order, Plaintiff is filing and effecting service of process of this Complaint to preserve all of its rights and claims with respect to this Defendant; however, Plaintiff reserves all of its rights in connection with the KFI Bankruptcy Injunction Order and otherwise.

43.    Defendant Kidde PLC, Inc. ("Kidde PLC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Nine Farm Springs Road, Farmington, Connecticut 06032. Kidde PLC was part of United Technologies Corporation. At all relevant times, Kidde PLC conducted business throughout the United States, including in California. Kidde PLC, through Kidde/Kidde Fire, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States,

including in California, and which has contaminated Plaintiff's property and drinking water supply. In accordance with the KFI Bankruptcy Injunction Order, Plaintiff is filing and effecting service of process of this Complaint to preserve all of its rights and claims with respect to this Defendant; however, Plaintiff reserves all of its rights in connection with the KFI Bankruptcy Injunction Order and otherwise.

44.    Defendant National Foam, Inc. (a/k/a Chubb National Foam) ("National Foam") is a Pennsylvania corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382. National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). At all relevant times, National Foam manufactured fire suppression products, including AFFF that contained PFAS compounds.

45.    Defendant Arkema, Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406. Arkema and/or its predecessors manufactured fluorosurfactants used in AFFF. Arkema is a successor in interest to Atochem North American, Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. and does and/or has done business throughout the United States and is registered to business in the state of California.

46.    AGC Chemicals Americas Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having a principal place of business in 5 East Uwchlan Avenue, Suite 201, Exton, PA 19341. AGC and/or its affiliates manufactured fluorochemicals used in AFFF. AGC does and/or has done business throughout the United States. On information and belief, AGC is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass, Co., Ltd.) and does business throughout the United States and is registered to do business in the state of California.

47.    Defendant Dynax Corporation ("Dynax") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive

Elmsford, New York 10523-1544. Dynax manufactured fluorosurfactants used in AFFF and does and/or has done business throughout the United States.

48.     Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorochemical Products for use in AFFF sold throughout the United States, including in California where it is registered to do business. On information and belief, Archroma is a successor to Clariant Corporation, which manufactured fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc.

49.     Defendants AGC, Archroma, Arkema, BASF, Buckeye, Carrier Fire, Carrier Global, Chemguard, Clariant, Dynax, Kidde PLC, National Foam, and Tyco are sued here for damages and other relief as to all of Plaintiffs' property and resources, including their drinking water supplies. No claim asserted herein shall be read as asserting any claim against any Defendant that which is currently barred or stayed per Order of the Court in AFFF MDL No. 2:18-mn-2873 (D.S.C.) and shall be read consistent with all such Orders and to give full effect to all such Orders while they are in force.  Likewise, no claim asserted herein shall be pursued in contravention of that certain "Order Preliminarily Extending the Automatic Stay and Granting Certain Injunctive Relief Pursuant to §105" (as amended and extended from time to time, the "KFI Bankruptcy Injunction Order"), entered in Adv. Pro. No. 23-50387(LSS), in the U.S. Bankruptcy Court for the District of Delaware.

50.     Defendants Chemguard, Tyco, Buckeye, Carrier Fire, Carrier Global, Kidde PLC and National Foam are companies that manufactured AFFF that entered into the stream of commerce, including in California, and was used by municipal and other fire departments, airports, and other agencies in fire training such that the PFAS it contained ultimately traveled to the water within the Basin. Collectively Chemguard, Tyco, Buckeye, Carrier Fire, Carrier Global, Kidde PLC and National Foam are referred to as the "AFFF Defendants."

51.    Defendants Arkema, Archroma, AGC, Dynax, BASF, Clariant and Chemguard manufactured, distributed, and/or sold fluorosurfactants and/or other fluorochemical intermediates for use in the manufacture of AFFF by some or all of the AFFF Defendants. Arkema, Archroma, AGC, Dynax, BASF, Clariant and Chemguard are referred to collectively in this Complaint as the "Surfactant/Intermediary Defendants."

## JURISDICTION AND VENUE

52.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and amount in controversy exceeds $75,000.

53.    Plaintiffs are filing this complaint as permitted by Case Management Order No. 3 (CMO 3) issued by Judge Richard M. Gergel of this Court. Pursuant to CMO 3, Plaintiffs designate the United States District Court for the Central District of California as the "home venue" where Plaintiffs originally filed suit pursuant to 28 U.S.C. § 1391, prior to it being transferred to this Court by the Judicial Panel of Multidistrict Litigation. But for CMO 3, venue is proper in the United States District Court for the Central District of California in that the events or omissions giving rise to the claim occurred in that district. Plaintiff respectfully requests that at the time of the transfer of this action back to trial court for further proceedings, this case be transferred back to the United States District Court for the Central District of California.

54.    The United States District Court for the Central District of California has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing Fluorochemical Products, including AFFF, to various locations in the United States and California, such that each Defendant knew or should have known that said products would be delivered to areas in the State of California for active use including, but not limited to, during the course of training and firefighting activities, including areas within the Basin.

55.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Defendants engaged in and were authorized to do business in the state of California.

56.    Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Defendants have engaged in substantial, continuous economic activity in California, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFOS, PFOA, and PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS and/or PFHxS, and that said activity by the Defendants is substantially connected to the Plaintiffs' claims as alleged herein.

57.    Based on information and belief, the Defendants purposefully affiliated themselves with the forum of the State of California giving rise to the underlying controversy. Such purposeful availment and activities within and related to the State of California are believed to include, but are not limited to, 1) the Defendants' contractual relationships with the entities giving rise to researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFOS, PFOA, PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS and/or PFHxS, and that said activity is substantially connected to the Plaintiffs' claims as alleged herein; 2) agreements between the Defendants and entities, institutions and thought leader academics within State of California regarding the PFOS, PFOA, PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS and/or PFHxS where the Defendants contractually consented to have state courts within the State of California adjudicate disputes; 3) marketing, advertising, selling, and advising third-party sellers of, the PFOS, PFOA, PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS and/or PFHxS, targeted specifically to consumers and businesses within the State of California; 4) lobbying, consulting, and advisory efforts on behalf of the Defendants with regard to the PFOS, PFOA, PFBS, and/or products that contain PFOS and/or PFOA and/or PFBS and/or PFHxS stemming from law firms and other agents in the State of California; and 5) and other actions by Defendants targeted to the State of California to be obtained through discovery and other means. As the location from which the Defendants' suit-

related conduct arose, California has a substantial vested interest in the acts of the Defendants which led to the underlying controversy.

58.    At all times herein mentioned, the Defendants, and each of them, had actual knowledge that each of the other Defendants was going to intentionally and negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in Complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of care owed by each of the Defendants to Plaintiffs.

59.    Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Central District of California does not offend traditional notions of fair play and substantial justice.

## BACKGROUND AND FACTUAL ALLEGATIONS

60.    OCWD manages the Basin in northern and central Orange County in order to support a variety of beneficial uses, including potable and non-potable water supply. Much of the potable water supply currently used within northern and central Orange County is groundwater pumped from the Basin for use by persons and Producers within OCWD's service area. Such groundwater is transported, reclaimed, purified, treated, injected, extracted, and otherwise managed by OCWD. Because Orange County is located in a semi-arid area, it is essential that all reasonable efforts be put forth by OCWD, in cooperation with the Producers, to protect the quality and quantity of groundwater supplies and to facilitate maximum utilization of local groundwater resources within OCWD's boundaries.

61.    PFAS are a family of chemical compounds containing fluorine and carbon atoms.

62.    PFAS have been prevalently used for decades in industrial settings and in the production of thousands of common household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant.

63.    The PFAS family of chemicals are entirely anthropogenic and do not exist in nature.

64.    PFOA, PFOS, PFBS, and PFHxS are PFAS that are known to have characteristics

that cause extensive and persistent environmental contamination.

65.    Specifically, PFOA, PFOS, PFBS, and PFHxS are persistent, toxic, and bioaccumulative as well as mobile.

66.    PFOA, PFOS, PFBS, and PFHxS are mobile in that they are soluble and do not easily adsorb (stick) to soil particles.

67.    PFOA, PFOS, PFBS, and PFHxS are readily transported through the air as well as the soil and into groundwater where they can migrate long distances.

68.    PFOA, PFOS, PFBS, and PFHxS are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water or wastewater.

69.    PFOA, PFOS, PFBS, and PFHxS are thermally, chemically, and biologically stable in the environment and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

70.    Once these PFAS compounds are applied, discharged, disposed of, or otherwise released onto land or into the air, soil, sediments, or water, they migrate through the environment and into groundwater and surface water.

71.    These compounds resist natural degradation and are difficult and costly to remove from soil and water.

72.    PFOA, PFOS, PFBS, and PFHxS bioaccumulate, biopersist, and biomagnify in the food web including in people and other organisms.

73.    Exposure to certain PFAS has been associated with several negative health outcomes in both humans and animals, including, but not limited to, the following:

a.    Altered growth, learning, and behavior of infants and older children;

b.    Lowering a woman's chance of getting pregnant;

c.    Interference with the body's natural hormones;

d.    Increased cholesterol levels;

e.    Modulation of the immune system;

f.    Increased risk of certain cancers; and

g.    Increased risk of ulcerative colitis.

74.    Contamination from PFOS and/or PFOA and/or PFBS and/or PFHxS presents a threat to public health and the environment.

75.    In addition to drinking contaminated water, humans can be exposed to PFOA, PFOS, PFBS, and PFHxS through inhalation, ingestion of contaminated food, and dermal contact.

76.    PFOA, PFOS, PFBS, and PFHxS enter the environment from industrial facilities that use PFAS in the manufacture or production of other products.

77.    Releases to land, air, and water from industrial sites are known pathways to the environment.

78.    PFOA, PFOS, PFBS, and PFHxS may also enter the environment from wastewater treatment facilities and also when released from PFAS-containing consumer and commercial products during their use and after they have been disposed to landfills or in any other manner.

79.    PFOA, PFOS, PFBS, and PFHxS may also enter the environment when released from PFAS-containing consumer and commercial products during their use, and after they have been disposed.

80.    On information and belief, contaminated water resources within the Basin have been impacted by use and discharge of AFFF, such that AFFF has traveled via surface, groundwater, and recharge water to contaminate wells within the Basin, as well as from other Fluorochemical Products, PFAS sources, and pathways, including but not limited to the use of recycled water and stormwater contaminated with PFAS for groundwater recharge in the Basin, and impacts from nearby landfills.

81.    On information and belief, ordinary stormwater flows transport PFAS that have been released into the environment from these various pathways of contamination to surface and groundwater in and around the Basin, including from discharge to wastewater, disposal to landfills, and other avenues of disposal in any other manner.

82.    The California State Water Resources Control Board has concluded that, among

the "major sources of PFAS" are: industrial sites, landfills, and wastewater treatment plants/biosolids. It elaborates: "PFAS can get into drinking water when products containing them are used or spilled onto the ground or into lakes and rivers. Once in groundwater, PFAS are easily transported large distances and can contaminate drinking wells. PFAS in the air can also end up in rivers and lakes used for drinking water."

83.    For example, the State Water Resources Control Board has investigated landfills as potential sources of PFAS contamination, concluding that "investigation is necessary at and around landfills statewide to determine the presence of PFAS, their respective levels in leachate and groundwater, and to evaluate the impact of current and historic discharges from these facilities on groundwater quality," clearly indicating that within California, PFAS contamination is of concern near landfills, prompting the State to sample the same.[3]

84.    In the same way that PFAS are released from consumer products through their disposal in landfills, PFAS are also released from consumer products directly into the wastewater stream, e.g., by laundering PFAS-coated clothing, through use of PFAS-containing home care products, like Scotchgard®, Stainmaster®, Polartec®, and Gore-tex® fabric coatings and cleaners, and through use of PFAS-containing cook wear, including Teflon®.

85.    Also, on information and belief, the Defendants, sold PFAS and/or PFAS-containing products to companies with California locations that Defendants knew or should have known would be used and/or disposed of in California.

86.    This includes retail sales of products resulting from Defendants' intentional marketing activities aimed at California markets as well as Defendants' sales to third parties who ultimately incorporated PFAS compounds into a finished product, which the Defendants knew or should have known would be used and/or disposed of in California.

87.    In each of these circumstances, Defendants have directed PFAS or PFAS-containing products and intermediates to California consumers or businesses for consumption and disposal in California.

---

[3] https://www.waterboards.ca.gov/pfas/docs/landfill_pfas_13267_go_03202019.pdf (last accessed Feb. 2, 2021).

88.    All the while, the Defendants have known of health and environmental risks associated with PFAS compounds for decades but concealed that knowledge until it was exposed through litigation and regulatory action in relatively recent years.

89.    The Defendants' manufacture, distribution and/or sale of PFOS and/or PFOA and/or PFBR and/or products containing PFOA and/or PFOS and/or PFBS and/or PFHxS resulted in the release of PFOS and/or PFOA and/or PFBS and/or PFHxS into the environment.

90.    Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, the Manufacturer Defendants knew, foresaw, and/or should have known and/or foreseen that PFOS and/or PFOA and/or PFBS and/or PFHxS would contaminate the environment.

91.    The Defendants knew, foresaw, and/or should have known and/or foreseen that their marketing, promotion, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use of PFOS and/or PFOA and/or PFBS and/or PFHxS containing materials, including in California, would result in the contamination of the groundwater that is the primary source of water supply for Plaintiffs' public water systems.

92.    The Defendants' products were unreasonably and inherently dangerous and the Defendants failed to warn of this danger.

### DEFENDANTS' LIABILITY

93.    Defendants' manufacture, distribution, and sale of AFFF has caused, and continues to cause, widespread injury to groundwater and surface water.

94.    Defendants knew or should have known that AFFF would cause injury to groundwater and surface water, fish, wildlife, marine resources, and other natural resources of the County, as well as its citizens.

95.    Defendants knew or should have known that PFAS in AFFF would be released into the environment.

96.    Defendants knew or should have known that such releases from the use or disposal of AFFF would injure the groundwater and surface water resources.

97.    Defendants knew or should have known that such releases from the use or disposal of AFFF would make groundwater and surface water unfit for drinking.

98.    Defendants knew or should have known that PFAS would be released into the environment from the use or disposal of AFFF.

99.    Defendants' products were defective in design in a manner that was unreasonably dangerous to users or consumers including Plaintiffs.

100.    The defective products were sold by the Defendants who are in the business of selling such products.

101.    The use of the products by Plaintiffs and others was reasonably foreseeable by the Defendants.

102.    The losses, damages, and harms suffered by Plaintiffs described herein would not have occurred but for the conduct of Defendants, and the Defendants' conduct was a substantial factor in causing the losses, damages and harms.

103.    The Defendants failed to warn of the dangers of their products.

104.    To enhance their profits, the Defendants knowingly and deliberately failed to remedy the known defects in their AFFF-related products and failed to warn the public, including Plaintiffs, that the subject products were inherently dangerous, and that there was an extreme risk of injury and harm occasioned by the inherently dangerous nature of the products and defects inherent in the products. Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of the subject products knowing that the public, including Plaintiffs, would be exposed to harm and danger in order to advance Defendants' own pecuniary interest.

105.    Based on information and belief, Plaintiffs allege that, at all relevant times alleged herein, the Defendants' conduct was despicable, wanton, reckless, malicious, and oppressive, and

was carried on by the Defendants with willful and conscious disregard for safety, entitling Plaintiffs to enhanced compensatory damages.

## FIRST CAUSE OF ACTION

## Strict Product Liability Based on Design Defect

## (By Plaintiffs against AFFF Defendants)

106.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

107.    At all times relevant herein, AFFF Defendants were engaged in the business of researching, designing, manufacturing, testing, marketing, distributing, and/or selling AFFF containing PFAS. By doing so, AFFF Defendants impliedly warranted that AFFF was merchantable, safe, and fit for ordinary purposes for which it was used, including for fire- fighting training exercises.

108.    It was reasonably foreseeable that the AFFF containing PFAS that AFFF Defendants manufactured and/or distributed and sold would be used on in proximity to wells within the Basin.

109.    It was reasonably foreseeable that the AFFF containing PFAS that AFFF Defendants manufactured and/or distributed and sold would contaminate wells within the Basin and the groundwater and cause damages.

110.    AFFF Defendants' AFFF products were manufactured for placement into trade or commerce.

111.    AFFF Defendants marketed and sold AFFF for use in controlling and extinguishing aviation, marine, fuel, and other shallow spill fires.

112.    As manufacturers, AFFF Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

113.    By manufacturing and selling AFFF containing PFAS, AFFF Defendants warranted that such AFFF was merchantable, safe, and fit for ordinary purposes.

114.    On information and belief, the AFFF as manufactured and/or sold by AFFF Defendants reached the Basin without substantial change in its condition and was used by local fire training academies, local fire departments, and airports in a reasonably foreseeable and intended manner.

115.    The AFFF, as manufactured and/or sold by the AFFF Defendants, was "defective" and "unreasonably dangerous" when it left the AFFF Defendants' control, entered the stream of commerce, and was received by two local firefighting training academies and a fire department because it was dangerous to an extent beyond that which would be contemplated by the ordinary user of AFFF.

116.    The AFFF manufactured and/or sold by AFFF Defendants was defective in design because, even when used as intended and directed by AFFF Defendants, it can result in the contamination of soil and groundwater with PFAS, creating a significant threat to groundwater and drinking water supplies.

117.    The AFFF manufactured and/or sold by AFFF Defendants did not meet a consumer's reasonable expectation as to its safety because of its propensity to contaminate soil and groundwater when used as intended.

118.    AFFF Defendants failed to develop and make available alternative AFFF products that were designed in a safe or safer manner, even though such products were technologically feasible, practical, commercially viable, and marketable at the time AFFF Defendants introduced AFFF containing PFAS into the stream of commerce.

119.    AFFF Defendants failed to develop and make available alternative AFFF products that were designed in a safe or safer manner, even though such products were technologically feasible, practical, commercially viable, and marketable at the time AFFF Defendants introduced AFFF containing PFAS into the stream of commerce.

120.    The specific risk of harm in the form of soil, groundwater, and drinking water contamination from AFFF containing PFAS that AFFF Defendants manufactured and/or sold was reasonably foreseeable or discoverable by AFFF Defendants.

121.    PFAS are dangerous to an extent beyond that which would be contemplated by the ordinary consumer of AFFF.

122.    The design, formulation, manufacture and/or distribution and sale of AFFF containing PFAS that were known to be toxic and extremely mobile and persistent in the environment, was unreasonably dangerous.

123.    AFFF Defendants' introduction of AFFF containing PFAS into the stream of commerce was a proximate cause of Plaintiff's damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and other damages in an amount to be determined at trial. AFFF Defendants are strictly, jointly, and severally liable for all such damages.

## SECOND CAUSE OF ACTION

### Strict Products Liability Based on Failure to Warn

### (By Plaintiffs against AFFF Defendants)

124.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

125.    The use of AFFF in proximity to wells within the Basin, or to the Santa Ana River, for training of fire personnel in the use of AFFF was a reasonably foreseeable use. AFFF Defendants knew or should have known that AFFF used in this manner can contaminate soil and groundwater with PFAS, creating a significant threat to human health and the environment.

126.    It was foreseeable that PFAS from the AFFF that AFFF Defendants manufactured and sold would enter the and groundwater, resulting in the contamination of drinking water supplies that rely upon the groundwater for the source of drinking water, including within the Basin.

127.    AFFF Defendants had a duty to warn the users of AFFF of these hazards.

128.    AFFF Defendants, however, failed to provide adequate warnings of these hazards.

129.    AFFF Defendants' failure to issue the proper warnings relating to AFFF containing PFAS affected the market's acceptance of AFFF containing PFAS.

130.    AFFF Defendants' failure to issue the proper warnings relating to AFFF containing PFAS prevented the users of the product from treating it differently with respect to its use and environmental cleanup.

131.    AFFF Defendants' failure to issue the proper warnings related to AFFF containing PFAS prevented the users of the product from seeking alternative products, including but not limited to, using alternative products for purposes of training in the use of AFFF.

132.    AFFF Defendants' action in placing AFFF containing PFAS into the stream of commerce was a direct and proximate cause of Plaintiffs' injury.

133.    As a direct and proximate result of the Defendants' failure to warn, Plaintiffs have suffered damage, requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial. The AFFF Defendants are strictly, jointly, and severally liable for all such damages.

### THIRD CAUSE OF ACTION

### Negligence

### (By Plaintiffs against AFFF Defendants)

134.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

135.    AFFF Defendants had a duty to Plaintiffs to manufacture and/or market, distribute, and sell their AFFF in a manner that avoided contamination of the environment and drinking water supplies and avoided harm to those who foreseeably would be injured by the PFAS contained in Defendants' AFFF products.

136.    The use of AFFF Defendants' AFFF products at local fire training academies, fire departments, airports, and military installations was a reasonably foreseeable use. AFFF Defendants knew or should have known that its AFFF used in this manner would contaminate soil and groundwater with PFAS, creating a significant threat to human health and the environment. The AFFF Defendants had a duty to prevent the release of PFAS, in the foreseeable uses of AFFF.

137.    AFFF Defendants breached their duties when they negligently manufactured a dangerous product (AFFF), negligently marketed, distributed, and sold that product, and/or negligently failed to give adequate warning that such products should not have been used in a manner such as to result in the contamination of soil and groundwater.

138.    As a direct and proximate result of AFFF Defendants' breaches of their duties, AFFF Defendants caused Plaintiffs to suffer actual losses. Specifically, Plaintiffs suffered damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial. AFFF Defendants are strictly, jointly and severally liable for all such damages.

**FOURTH CAUSE OF ACTION**

**Continuing Trespass**

**(By Plaintiffs against AFFF Defendants)**

139.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

140.    Each of the Plaintiffs holds possessory property rights and interests in various parcels of land that have been contaminated with PFAS.

141.    The Producers own, possess, and actively exercise rights to extract and use groundwater drawn from their contaminated wells.

142.    OCWD appropriates surface and groundwater from multiple sources which is collected and contained, then added to the Basin to recharge it. OCWD maintains an appropriative right to reclaim or re-appropriate water it has recharged into a river or the Basin.

143.    The AFFF Defendants were engaged in the business of researching, designing, formulating, handling, training, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for AFFF and knew or should have known that the subsequent and foreseeable use and disposal of AFFF would contaminate the groundwater and drinking water supply wells. Thus, the AFFF Defendants intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity, caused noxious

and hazardous contaminants and pollutants to enter the surface water, groundwater, replenishment water, and drinking water supply.

144.     AFFF and PFAS compounds manufactured and/or supplied by the AFFF Defendants continue to be located in the water resources within the Basin, including the groundwater that supplies drinking water within the Basin.

145.     Plaintiffs did not, and do not, consent to the trespass alleged herein. The AFFF Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

146.     The contamination of surface water, groundwater, and wells within the Basin alleged herein has not yet ceased. PFAS continue to migrate into and enter groundwater within the Basin.

147.     As a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the surface water, groundwater, replenishment water, and drinking water supply have been, and continue to be, contaminated with PFAS, causing Plaintiffs significant injury and damage.

148.     As a direct and proximate result of these AFFF Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the contamination of groundwater within the Basin in an amount to be proved at trial.

149.     As a further direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, Plaintiff seeks any benefits or profits obtained by AFFF Defendants related to the trespass under *Starrh & Starrh Cotton Growers v. Aera Energy LLC*, 153 Cal. App. 4th 583 (2007), and all other damages and remedies allowable under California Civil Code § 3334 and California law. The AFFF Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of drinking water supplies with PFAS. The AFFF Defendants committed each of the above-described acts and omissions knowingly, willfully, and

29

with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including groundwater within the Basin. Therefore, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish these AFFF Defendants and that fairly reflects the aggravating circumstances alleged herein.

**FIFTH CAUSE OF ACTION**

**Public and Private Nuisance**

**(By Plaintiffs against AFFF Defendants)**

150.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

151.    OCWD is responsible for managing the vast groundwater basin that provides most of northern and central Orange County's drinking water. As part of its groundwater management, OCWD owns, manages and/or maintains aquifer recharge systems to replace the water that is pumped from wells belonging to local water agencies, cities and other groundwater users.

152.    The Producers are the owners of land, easements, and water rights which permit them to extract groundwater for use in their respective public water systems.

153.    The actions of the AFFF Defendants as alleged herein, have resulted in the continuing contamination of the Plaintiffs' contaminated wells, surface water, groundwater and replenishment water with PFAS, and such contamination is a public nuisance as defined in California Civil Code section 3479, California Civil Code section 3480, California Health and Safety Code section 5410, and California Water Code section 13050, and is reasonably abatable and varies over time. Each Manufacturing Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

154.    The actions of the AFFF Defendants constitute a nuisance in that the contamination of groundwater and drinking water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiffs' free use of their property, so as to interfere with the

30

comfortable enjoyment of life or property. The contamination of the Plaintiffs' contaminated wells, surface water, groundwater, and replenishment water significantly affects, at the same time, a considerable number of people in an entire community.

155.    Each AFFF Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

156.    By its design, the AFFF Defendants' AFFF were known by AFFF Defendants to contain compounds that would likely be discharged to the environment in a manner that would create a nuisance and further failed to properly instruct intermediaries and end-users to properly use and dispose of such contaminants in such a manner as to avoid creating or contributing to a nuisance.

157.    The AFFF Defendants knew, or should have known, of the harmful effects and adverse impacts that exposure to PFAS would have on the environment and human health.

158.    The AFFF Defendants caused or contributed to the creation of the nuisance at issue by directing and instructing intermediaries and end users of its products to dispose of products and materials containing PFAS in a manner that the AFFF Defendants knew or should have known would result in the contamination of soil and groundwater and ultimately impact drinking water.

159.    Plaintiffs did not and does not consent to the public nuisance alleged herein. AFFF Defendants knew or reasonably should have known that Plaintiffs would not consent to this public nuisance.

160.    As a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the contaminated wells within the Basin and the groundwaters that supply them have been, and continue to be, contaminated with PFAS, causing Plaintiff significant injury and damage.

161.    As a direct and proximate result of these AFFF Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation, and monitoring costs and expenses related to the PFAS in an amount to be proved at trial.

162.    Furthermore, as a direct and proximate result of the AFFF Defendants' acts and omissions as alleged herein, the contamination of groundwater and drinking water supplies constitutes an ongoing public nuisance. The AFFF Defendants are jointly and severally responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the PFAS that contaminate the aquifer and other water resources supplying water the Basin do not present a risk to the public.

163.    Plaintiffs have been damaged because the AFFF Defendants' acts and omissions, have unreasonably interfered with, and continue to interfere with, Plaintiff's free use of its water rights and continues to suffer significant damages and injuries, including but not limited to, incurring costs related to the investigation, sampling, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the detection and remediation of the PFAS contamination of its water supply systems.

164.    The AFFF Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of drinking water supplies with PFAS.

165.    The AFFF Defendants knew with substantial certainty at the time of their manufacture and sale of fluorosurfactants, fluorochemicals, and AFFF containing PFAS that their products would result in contamination of drinking water resources within the Basin.

166.    The AFFF Defendants' acts and omissions were substantially certain to and did result in an unreasonable interference with wells within the Basin.

167.    As a direct and proximate result of the AFFF Defendants' acts and omissions, the AFFF Defendants caused Plaintiff to suffer actual losses.

168.    The AFFF Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, fluorosurfactants, and fluorochemicals to maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment.

169.    Specifically, Plaintiffs suffered damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial.

170.    Additionally, Plaintiffs also request an award of exemplary damages in an amount that is sufficient to punish these AFFF Defendants and that fairly reflects the aggravating circumstances alleged herein.

## SIXTH CAUSE OF ACTION

### Liability of Surfactant/Intermediary Defendants for Counts 1-5

### (By Plaintiffs against Surfactant/Intermediary Defendants)

171.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

172.    Plaintiffs assert the same allegations and causes of action described above in counts eleven through fifteen against the Surfactant/Intermediary Defendants to the extent that their manufacture and sale of fluorosurfactants and/or fluorochemicals or the failure to disclose the risks and harms associated with the use of their fluorosurfactants and/or fluorochemicals in the manufacture of AFFF resulted in damages to Plaintiff as described herein.

## SEVENTH CAUSE OF ACTION

### OCWD Act Section 8

### (By OCWD against All Defendants)

173.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Third Amended Complaint as if fully set forth herein.

174.    The OCWD Act authorizes OCWD to "expend available funds to perform any cleanup, abatement, or remedial work required under the circumstances which, in the determination of the board of directors, is required by the magnitude of the endeavor or the urgency of prompt action needed to prevent, abate, or contain any threatened or existing contamination of, or pollution to, the surface or groundwaters of the district. This action may be

taken in default of, or in addition to, remedial work by the person causing the contamination or pollution, or other persons." (OCWD Act § 8(b)).

175.    The Act further provides "the contamination or pollution is cleaned up or contained, the effects thereof abated, or in the case of threatened contamination or pollution, other necessary remedial action is taken, the person causing or threatening to cause that contamination or pollution shall be liable to the district to the extent of the reasonable costs actually incurred in cleaning up or containing the contamination or pollution, abating the effects of the contamination or pollution, or taking other remedial action. The amount of those costs, together with court costs and reasonable attorneys' fees, shall be recoverable in a civil action by, and paid to, the district." (OCWD Act § 8(c)).

176.    OCWD's Board of Directors (the "Board") has determined that investigation and remedial work is required given the magnitude of PFAS contamination and the potential impacts to public health, as described in this Complaint, and that prompt action is needed and legally required to clean up or contain the contamination or pollution, abate the effects of the contamination or pollution, or take other remedial action to prevent, abate, contain, and dispose of threatened and existing contamination. The Board has authorized the expenditure of funds to conduct such investigation and remediation and has authorized action to recover all costs and damages associated with such contamination.

177.    Defendants caused OCWD to conduct investigations into the quality of the groundwater within OCWD's territorial jurisdiction to determine whether those waters are contaminated or polluted with PFAS at a substantial cost to OCWD in an amount to be proved at trial.

178.    Defendants caused OCWD to perform cleanup, abatement, and/or remedial work needed to prevent, abate, and/or contain threatened or existing contamination of, or pollution to, the groundwater, including the aquifer, within OCWD's territorial jurisdiction, all at a substantial cost to OCWD an amount to be proved at trial.

179.    As a direct and proximate cause of the Defendants' acts and omission, OCWD initiated a program to assess, evaluate, investigate, monitor, abate, clean up, correct, contain the contamination of the aquifer and remove PFAS from drinking water being served to citizens and businesses, and/or take other necessary remedial action, all at significant expense, cost, loss, and damage in amounts to be proved at trial.

180.    As a direct and proximate result of the acts and omissions alleged in this Third Amended Complaint, OCWD has and/or will incur substantially increased expenses, all to OCWD's damage, in an amount to be proved at trial. OCWD has and will incur costs and attorney's fees prosecuting this action. OCWD is entitled to recover all such damages, together with court costs and reasonable attorney's fees, in this action.

181.    As a direct and proximate result of the Defendants' conduct, OCWD is entitled to recover all past, present, and future response costs, together with interest from the Defendants, as well as damages for injury, loss, and damages to natural resources.

## EIGHTH CAUSE OF ACTION

### Declaratory Relief

### (By all Plaintiffs against All Defendants)

182.    Plaintiffs repeat and restate the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

183.    Defendants knew, or should have known, that PFAS, when used in a foreseeable and intended manner, were dangerous and created an unreasonable and excessive risk of harm to human health and the environment.

184.    Defendants intentionally, willfully, deliberately and/or negligently failed to properly handle, control, dispose, and release noxious and hazardous contaminants and pollutants, such that Defendants created substantial and unreasonable threats to human health and the environment, which resulted from the foreseeable and intended use and storage of PFAS and products containing those substances.

185.    Among other things, OCWD must take costly remedial action to remove PFAS contamination which will result in substantial costs, expenses and damages in an amount to be proved at trial.

186.    These Defendants, and each of them, have failed to reimburse OCWD and the Plaintiffs for OCWD's investigation, remediation, cleanup, and disposal costs and deny any responsibility or liability for these damages and expenses the OCWD will incur in the future.

187.    An actual controversy exists concerning who is financially responsible for abating actual or threatened pollution or contamination of groundwater resources, including the aquifer, and Plaintiffs' contaminated wells within OCWD's territorial jurisdiction by PFAS.

188.    In order to resolve this controversy, OCWD seeks an adjudication of the respective rights and obligations of the parties, and other relief to the extent necessary to provide full relief to OCWD.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a trial of this action before a jury, and that, upon a favorable verdict, this Court enter judgment in favor of Plaintiffs and against Defendants, jointly and severally, as follows:

A.    An award of compensatory damages according to proof;

B.    An award pursuant to California Civil Code § 3334 of the value of the use of Plaintiffs' property for the time of the wrongful occupation, the reasonable costs of repair or restoration of all of Plaintiffs' property to its original condition, costs associated with recovering the possession, any benefits or profits obtained by Defendants, and all other damages and remedies allowable under California Civil Code § 3334 and California law;

C.    An award of exemplary and punitive damages according to proof;

D.    An order declaring that Defendants' actions constitute a nuisance and requiring Defendants to take such action as is necessary to abate the public nuisance, to take such action as is necessary to ensure that the PFAS that contaminate the aquifers supplying water to the

Plaintiffs' public water systems do not present a risk to the public, and to award damages to the Plaintiffs caused by the nuisance;

E.    An order declaring that Defendants are financially responsible for abating actual or threatened pollution or PFAS contamination of groundwater resources, including the aquifer within OCWD's service area and Plaintiffs' contaminated wells;

F.    An award of Plaintiffs' costs in prosecuting this action, including reasonable attorneys' fees, together with prejudgment interest to the full extent permitted by law; and

G.    An award of such other further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

Respectfully submitted,

ORANGE COUNTY WATER DISTRICT, CITY OF ANAHEIM, EAST ORANGE COUNTY WATER DISTRICT, CITY OF FULLERTON, CITY OF GARDEN GROVE, IRVINE RANCH WATER DISTRICT, CITY OF ORANGE, CITY OF SANTA ANA, SERRANO WATER DISTRICT, CITY OF TUSTIN, YORBA LINDA WATER DISTRICT, CITY OF HUNTINGTON BEACH, CITY OF NEWPORT BEACH, CITY OF WESTMINSTER, AND CITY OF BUENA PARK,

By Their Attorneys,

Date:  May 24, 2024          */s/ Kenneth A. Sansone*
Kenneth A. Sansone
SL ENVIRONMENTAL LAW GROUP PC
175 Chestnut Street
San Francisco, CA 94133
Telephone: (603) 227-6298
Facsimile: (415) 384-8333
ksansone@slenvironment.com

Daniel S. Robinson
ROBINSON CALCAGNIE, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660

Telephone: 949-720-1288
Facsimile: 949-720-1292
drobinson@robinsonfirm.com

Andrew W. Homer
KELLEY DRYE & WARREN LLP
7825 Fay Avenue, Suite 200
La Jolla, CA 92037
Telephone: (858) 795-0426
ahomer@kelleydrye.com

Robert A. Bilott
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Telephone: (513) 381-2838
Facsimile: (513) 381-0205
bilott@taftlaw.com

David J. Butler
TAFT STETTINIUS & HOLLISTER LLP
65 East State Street, Suite 1000
Columbus, Ohio 43215
Telephone: (614) 221-2838
Facsimile: (614) 221-2007
dbutler@taftlaw.com

Kevin J. Madonna
LAW OFFICE OF KEVIN MADONNA, PLLC
48 Dewitt Mills Road Hurley, NY 12443
Telephone: (845) 481-2622
Facsimile (845) 230-3111
kmadonna@kennedymadonna.com

Gary J. Douglas
Michael A. London
Rebecca G. Newman
Tate J. Kunkle
DOUGLAS & LONDON, P.C.
59 Maiden Ln, 6th Fl,
New York, NY 10038
Telephone: (212) 566-7500
gdouglas@douglasandlondon.com
mlondon@douglasandlondon.com
rnewman@douglasandlondon.com
tkunkle@douglasandlondon.com